**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

LANDSTAR GLOBAL LOGISTICS, INC.,

                 Plaintiff,

vs.                                        Case No. 3:09-cv-1163-J-32JRK

ANNEMARIE HASKINS, et. al.,

                 Defendant.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case involves a dispute between Landstar Global Logistics, Inc. ("Landstar"), and its former transportation agent, AC Logistics, Inc. ("AC"), which is owned and operated by Annemarie Haskins. The parties have asserted numerous contract and tort claims arising from their agency relationship. The case was tried to the Court on October 6, 7, 11, 13, 14, 18, 2011. Following trial, the parties submitted proposed findings of fact and conclusions of law. (Docs. 138, 139.) After consideration of the record, this case is ready for decision pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## I.    FINDINGS OF FACT

Landstar is a transportation and logistics company headquartered in Jacksonville, Florida. (Doc. 103 at 1-2.) Landstar utilizes a system of independent agents to arrange a variety of transportation and warehousing services for its customers. (Id.) Haskins is the president, director, sole shareholder, and managing employee of AC, a corporation that solicits and arranges for the shipment of goods. (Id. at 2.)

A.    The Agency Agreement

On January 20, 2006, Landstar and AC entered into an Agency Agreement.[1]   Under this agreement, AC agreed to serve as an independent Landstar agent for the purposes of soliciting, shipping, and documenting freight.   Landstar compensated AC by paying a commission on each load AC arranged.   AC received a commission equal to 60% of the net profit on each intermodal load—a shipment that utilized more than one mode of transportation—and 50% of the net profit on each truck brokerage load.  (P-1.)

Because AC's commissions were based on net profitability, determining the proper commission payment required accurate cost data on each load.   AC was responsible for entering the billing and cost information into Landstar's computer system (the "ORBIT" system).   Under the procedures outlined in Landstar's Policy and Procedures Manual, AC was required to wait until all billing and cost information was known before electronically finalizing the costs of a load.[2]   (P-2 at 24.)  The "finalization" of a load then triggered the payment of a commission advance to AC based on the information that had been entered by AC.  (Doc. 134, Trial Tr. Vol. 4, at 171-72.)  Thus, if AC failed to follow the required procedures, and the cost information entered by AC was incorrect, the commission paid by Landstar would not reflect the amount specified in the Agency Agreement.

_____

[1] Haskins also personally guaranteed all of AC's obligations under the Agency Agreement and agreed that she would be jointly and severally liable for any default by AC.  (See P-1 at 11.)

[2] The Agency Agreement required AC to follow the procedures listed in the Policy and Procedures Manual.  (P-1.)

2

B.     Rez-1 Charges and AC's Finalization Procedure

This dispute principally arises from the parties' accounting for costs incurred from REZ-1, a company that provided the containers used for shipping goods in intermodal transportation. (Doc. 103 at 23.)  Charges from REZ-1, or "REZ charges," were incurred at a set amount—typically $17— for each day a container was in use.  Id.  To comply with the Agency Agreement's requirement that finalization occur only when actual costs were known, AC was required to enter accurate REZ charges prior to finalization, which generally could only be done after delivery.[3]

Throughout the term of the agency, however, AC repeatedly recorded understated REZ charges in the ORBIT system prior to finalization.  In early 2006,  AC entered very little for REZ charges, resulting in overstated profit margins and inflated commissions. (See Doc. 131, Trial Tr. vol. 3 at 118-19; Doc. 114-1, Skelston Dep. at 148, 151-52).  In July 2006, Landstar thus asked AC to refund $413,158 in overpaid commissions. (D-22).[4]  AC paid this amount back through reductions to its commissions going forward.  (Doc. 135, Trial Tr. vol. 5 at 43.)

At some point after the July 2006 adjustment, AC began to routinely enter REZ charges into ORBIT for its intermodal shipments.  However, rather than entering accurate

---

[3] REZ-1 operated a website, named ChannelSpeed, that allowed AC to determine the exact amount of REZ charges incurred prior to finalization. (See Doc. 129, Trial Tr. vol. 1, at 64-66; Doc. 134, Trial Tr. vol. 4 at 19; Doc. 114-1, Skelston Dep. at 43.)

[4] When AC failed to enter the full cost of each shipment by understating REZ charges, it overstated the net profit on each load.  AC was thus paid a commission equal to 60% of the inflated net profit.  The $413,158 that AC paid back to Landstar thus represents 60% of the REZ charges that AC failed to enter into ORBIT.

3

REZ charges based on the actual number of days a container was used during shipment, AC would routinely input $34 (or two days of REZ) for each load regardless of actual charges. (D-55; Doc. 135, Trial Tr. vol. 5 at 32-34; Doc. 114-1, Skelston Dep. at 179.) The parties would then reconcile these setup amounts with the actual REZ charges incurred on each shipment and make adjustments to AC's commissions going forward. (Doc. 131, Trial Tr. vol. 3 at 166-168, 174; Doc. 134, Trial Tr. vol. 4 at 197-98; Doc. 135, Trial Tr. vol. 5 at 28-29).[5] This process will be referred to as the "interim REZ policy."

Landstar was aware that AC was not finalizing orders in compliance with the policy provided in the Agency Agreement. (See D-116; Doc. 134, Trial Tr. vol. 4 at 83-84.) On several occasions, Landstar notified AC that $34 was insufficient to cover actual REZ charges for each load and instructed AC to enter only actual REZ charges. (See Doc. 134, Trial Tr. vol. 4 at 15-16, 18-28, 176-78, 183-86, 189; Doc. 135, Trial Tr. vol. 5 at 117; Doc. 114-1, Skelston Dep. at 184-86; P-13 (March 2008); P-62 (August 2006); P-86 (February 2009); P-89 (April 2009); P-91 (May 2009); P-420 (June 2007). On at least two separate occasions, Haskins told Landstar that AC would change its practices and begin to enter only accurate REZ data. (See Doc. 134, Trial Tr. vol. 4 at 16, 19-20, 23; P-13 (March 2008); P-125 (May 2009)).[6] Landstar, however, acknowledged that immediately switching practices

---

[5] In addition to the testimony cited above, AC's obligation to reimburse Landstar for any inflated commissions paid because of understated REZ charges is evidenced by the 2009 settlement, discussed below, wherein Haskins and AC acknowledged such liability.

[6] AC employees also stated that they were aware that Landstar did not approve of the manner in which AC was finalizing loads. (Court Ex. A, Ciuckis Dep. at 81-82, Kaelin Dep. at 74-75, 111-12.) At trial, the parties jointly submitted designations from the depositions of Jenny Ciuckis, Todd Cunningham, Matthew Haskins, Margaret Kaelin, Matthew Lyle,

would be an undue financial burden on AC.  Although no formal agreement was reached,

Landstar thus informally permitted AC to continue to follow the interim REZ policy for a

transition period of unspecified duration.  (See Doc. 130, Trial Tr. vol. 2 at 96; Doc. 135, Trial

Tr. vol. 5 at 32;  D-55;  D-116;  P-91.)   This practice consistently resulted in inflated

commissions being paid to AC.  (Doc. 134, Trial Tr. vol. 4 at 18-19, 189; P-496, P-549; Court

Ex. A, Lyle Dep. at 28, 33-35; Doc. 114-1, Skelston Dep. at 179.)[7]

In early 2009, Landstar notified AC that it would no longer be permitted to follow the

interim REZ policy and that it would be required to follow the finalization policy established

in the Agency Agreement.  (See, e.g., Doc. 134, Trial Tr. vol. 4 at 154; Doc. 135, Trial Tr. vol.

5 at 119-20; P-89; P-91; P-108; D-130; Court Ex. A, Matthew Haskins Dep. at 83, 90-91,

Neumann Dep. at 170.)  Recognizing that immediate compliance would impose a financial

hardship on AC, Landstar agreed to lend $32,000 to AC, as documented in a promissory

note executed on July 14, 2009 (the "July 2009 Note").[8]  The July 2009 Note states:

> Maker has up to the present time finalized billing and pricing
> under the Agency Agreement prior to shipment delivery. Such
> practice has resulted in the settlement of commissions payable
> to Maker for services rendered under the Agency Agreement

---

Sharon Neumann, Ronald Skelston, and Chris Wresche for the Court's consideration, and
the Court accepted the designations into evidence.  (Doc. 132, Trial Tr. vol. 6, at 131-32.)
Because these depositions do not appear to have been filed, the Court will now file them as
Court Ex. A.

[7] AC and Haskins repeatedly contended at trial that they requested an accounting from
Landstar and suspected that Landstar owed them money, rather than the other way around.
However, the preponderance of the evidence showed that Landstar's numbers were correct.

[8] Haskins also entered into a Guaranty for AC's obligations under the July 2009 Note.
(See P-108.)

> before all transportation costs are known with the result that such premature settlement necessitated ongoing adjustments to commission payments payable to Maker. Maker hereinafter agrees to finalize billing and pricing only following shipment delivery when all transportation costs are known.

The Note further provides that its proceeds would be used "exclusively for the purpose of financing [AC's] working capital in order to conduct [its] day to day business activities during the finalization of the billing and pricing transition." (P-108.) AC thus agreed to follow the finalization policy established in the Agency Agreement going forward.

At approximately the same time, in July 2009, the parties also agreed to settle all outstanding financial issues for the time period through March 20, 2009, including all issues related to REZ charges. (See, e.g., Doc. 132, Trial Tr. vol. 6 at 192.)[9] In this settlement, Landstar agreed to forgive half of AC's outstanding debt on several items, including REZ charges from August 2008 through March 20, 2009. (Docs. 130, Trial Tr. vol. 2 at 236-37; P-389.)[10] In total, AC agreed to pay Landstar $305,855 over a three year period through weekly deductions to AC's commissions. (Doc. 130, Trial Tr. vol. 2 at 246-47; P-34; P-

---

[9] Although Landstar argued at trial that the settlement did not include charges for REZ from 2006 and sought $299,000 in damages for alleged 2006 overpayments, Landstar acknowledged in its Proposed Findings of Fact and Conclusions of Law that the evidence advanced at trial shows that the settlement "extinguished all claims by each party against the other for commissions or amounts due from 2006 through March 20, 2009." (Doc. 139 at 23.) The Court agrees that the 2009 settlement extinguished any claims for 2006 overpayments.

[10] The reduction in AC's debt totaled approximately $120,000. (Docs. 130, Trial Tr. vol. 2 at 251; Doc. 135, Trial Tr. vol. 5 at 130.)

389).[11]

### C.   The Truckload Contract with Campbells

Unrelated to the issue of REZ and finalization, AC was awarded a significant truckload contract with one of its customers, Campbells Soup, in the spring of 2007.  (Doc. 131, Trial Tr. vol. 3 at 108-09.)  To service this contract, AC hired additional employees, expanded its offices, and purchased additional equipment.  (Id.)  Landstar and AC, however, were unable to provide the necessary truckload capacity and thus lost the contract with Campbells.  (Id. at 53-54.)

After the truckload business failed, Landstar loaned AC funds to allow it to recover the costs it had incurred when setting up its truckload business.  (Doc. 129, Trial Tr. vol.  1 at 223; Doc. 134, Trial Tr. vol. 4 at 59).  This loan is evidenced by a promissory note dated August 1, 2008, in principal amount of $305,156.81 (the "August 2008 Note").  (P-185.)[12]

### D.   Landstar's Termination of AC

The relationship between Landstar and AC deteriorated throughout the last half of 2009.  In June 2009, AC sent a letter to Landstar which detailed a number of concerns and

---

[11] Although defendants argued at trial that this amount was subject to a further 30% reduction, the evidence does not support this contention.  Some of the evidence does refer to a 30% adjustment to AC's obligations (see D-130); however, this is not inconsistent with the 50% reduction found by the Court.  When AC understated REZ charges, it overstated net profits, and AC received 60% of any inflated net profits as commission payments.  Thus, when Landstar agreed to forgive half of AC's debt on certain items, it agreed that AC would pay back only 30% of the artificially inflated net profits (or, in other words, half of the inflated commission paid to AC).

[12] Haskins also entered into a Guaranty for AC's obligations under the August 2008 Note. (See P-185.)

stated that AC was "experiencing some difficulties on continuing business relations with Landstar." (D-123.) Haskins also presented concerns to Landstar at a meeting in October 2009. (Doc. 131, Trial Tr. vol. 3 at 198.) When these issues were not resolved to her satisfaction, Haskins told Landstar on November 16, 2009 that she was turning the matter over to counsel. (P-467.)[13] Moreover, despite its representations to the contrary in the July 2009 Note, AC continued to follow the interim REZ policy, resulting in further inflated commissions. (See, e.g., Doc. 135, Trial Tr. vol. 5 at 119; P-549.)

On December 1, 2009, Landstar terminated the Agency Agreement, effective immediately, without providing any prior notice to AC. Landstar also immediately began notifying AC's customers of the termination and trying to retain them as Landstar customers. (Doc. 130, Trial Tr. vol. 2 at 27-28; D-220.) That same day, Haskins notified AC's customers that, going forward, it would have an agency relationship with Landstar's competitor, the HUB Group. (Doc. 131, Trial Tr. vol. 3 at 46; P-191.) However, following termination, Campbells, AC's largest customer, decided to stay with Landstar rather than follow AC to HUB.

## II.   CONCLUSIONS OF LAW AND THE COURT'S DECISION

### A.   Claims Arising Under the Agency Agreement

Landstar contends AC breached the Agency Agreement by, among other things, entering inaccurate cost information into ORBIT and failing to pay back the resulting inflated commissions. (Doc. 1 at 6-7.) In their counterclaim for breach of contract, defendants assert

---

[13] At approximately the same time, Haskins and other AC employees also made serious accusation of misconduct against Landstar. (See P-465; P-470.)

8

that Landstar breached the Agency Agreement by failing to pay AC compensation due, improperly deducting sums from AC's commissions, and failing to properly support and bill AC's customers. (Doc. 42 at 37-38.) Defendants further allege that Landstar's violations of the Agency Agreement breached the implied covenants of good faith and good conduct. (Doc. 42 at 38-40, 48-49.)

### 1.   *Claims Arising Through March 2009*

The Court finds that all contract claims arising through March 20, 2009 were extinguished by the 2009 settlement.  Although, prior to that time, the parties had not conducted their relationship in strict accordance with the terms of the Agency Agreement, Landstar, Haskins, and AC agreed that all claims arising from such practices would be resolved by AC paying $305,855 to Landstar over a three year period through weekly deductions to AC's commissions. See supra pp. 6-7. After AC's commission deductions and other credits are taken into account, $267,595 of this obligation remains outstanding.  (Doc. 132, Trial Tr. vol.  6 at  205-06; P-540.)

### 2.   *Claims Arising After March 2009*

The parties disputed at trial whether AC's use of the interim REZ policy after March 2009 constituted a breach of the Agency Agreement; however, resolving that dispute is not necessary to determine the amount owed under the contract during that time.  The interim REZ policy required AC to eventually pay back any inflated commissions resulting from an understatement of shipping costs, and thus, regardless of whether AC breached the Agency Agreement by following the interim REZ policy, the same amount of money would be owed

9

to Landstar.[14]

The evidence presented at trial demonstrates that, under the terms of the Agency Agreement, AC owes $274,829 to Landstar for commissions overpayments and other adjustments accrued from March 2009 forward.   This total consists of the following amounts:[15]

- $63,754 in overpaid commissions resulting from understated REZ charges from April 6, 2009 to August 20, 2009;

- $125,014 in overpaid commissions resulting from understated REZ charges from September 8, 2009 to December 20, 2009;[16]

- $2,245 in overpaid commissions resulting from understated REZ charges from December 20, 2009 to January 5, 2010; and

- 83,816 for freight bill commission adjustments.[17]

These amounts are supported by the testimony of Landstar employees Cynthia Beasley (Doc. 134, Trial Tr. vol. 4 at 194-95, 226-39, Doc. 135, Trial Tr. vol. 5 at 5-17, 52-57, 85-87),

---

[14] The issue of breach instead relates to whether Landstar was entitled to terminate the Agency Agreement without providing prior notice.

[15] Although Landstar claims it is also entitled to "$4,421 in connection with an outstanding cargo claim," it has cited no record support for this amount.

[16] Although AC was terminated on December 1, 2009, and was paid no further commissions after that time, the amount of Landstar's overpayments to AC (which pre-dated termination) could not be determined until all REZ bills were later received.

[17] Rather than paying commissions to AC after termination, Landstar offset any earned commissions against the amount owed for these commission adjustments.  (See Doc. 135, Trial Tr. vol. 5 at 164-66; P-528.)

Marcia Arnold (Doc. 135, Trial Tr. vol. 5 at 103-04, 158-66), and numerous spreadsheets and workbooks maintained by Landstar (P-519; P-528; P-549).

The Court has considered defendants' argument that "the Rez related damages claimed by Landstar are too speculative to be recovered." (See, e.g., Doc. 138 at 34.) Having heard the testimony at trial, however, the Court concludes that Landstar has provided sufficient evidence of the amounts owed. At trial, AC's damages expert could identify no errors in Landstar's damages calculations or the sources Landstar relied upon. (Doc. 132, Trial Tr. vol. 6 at 207-09).[18] Although Haskins testified that Landstar's calculations are unreliable (Doc. 131, Trial Tr. vol. 3 at 188-191), the Court finds that her testimony was not credible on this point.[19]

3.   *Claims Arising from Termination*

The Agency Agreement provides that AC's "violation or failure to comply with the provisions of [the] Agreement or any of the policies or regulations promulgated by

---

[18] In fact, AC's damages expert testified that AC owed Landstar a substantial sum ($201,000) for overpaid commissions resulting from improper REZ accounting. (Doc. 132, Trial Tr. vol. 6, at 112.) Moreover, AC's damages expert also testified that many of his adjustments to the damages claimed by Landstar arose from events that occurred during 2006. (Doc. 132, Trial Tr. vol. 6 at 127, 195.) As explained above, however, all claims arising prior to March 2009 were extinguished in the 2009 settlement.

[19] The Court is also unpersuaded by the arguments advanced in AC's Proposed Findings of Fact and Conclusions of Law regarding Landstar's damage claims. (See Doc. 138 at 27-28.) Specifically, although Landstar produced no formal billing statements from REZ-1, as detailed in the sources cited above, Landstar proved the amounts paid to REZ by a preponderance of the evidence through its business records and testimony at trial. Moreover, AC has not provided sufficient evidence to substantiate its claims that Landstar impermissibly deducted sums for "agent variance" or that Landstar failed to properly account for the REZ amounts set up by AC. Notably, these claims were not supported by AC's own damages expert. (See Doc. 132, Trial Tr. vol. 6, at 112.)

LANDSTAR LOGISITICS . . . shall constitute full and sufficient reason for immediate termination of the Agreement by LANDSTAR LOGISTICS." (P-1 at 8.) Absent such a violation, the Agency Agreement required Landstar to give AC 30 days written notice before termination. (Id. at 3.)

Landstar contends it was justified in terminating AC without giving prior notice because AC violated the Agency Agreement by, among other things, entering inaccurate cost information prior to finalization and failing to pay back the resulting inflated commissions. (Doc. 1 at 6-7.) AC and Haskins contend they did not breach the Agency Agreement with respect to finalizing loads because Landstar directed AC to follow the interim REZ policy. (See Doc. 138 at 33.) Defendants thus assert that Landstar breached the Agency Agreement by terminating AC without giving prior notice. According to defendants, this improper termination caused AC to lose Campbells as a customer, resulting in substantial lost profits. (Doc. 138 at 36.)

Defendants, however, have not specified the legal vehicle by which the interim REZ policy came to legally supercede the procedure required under the Agency Agreement. Presumably, defendants, under the legal doctrines of waiver or modification, believe Landstar should not be permitted to claim that use of the interim REZ policy constituted a breach.[20] Neither of these doctrines, however, is applicable to the parties' conduct after the

---

[20] AC and Haskins have advanced no such legal theory, either in their Amended Answer (Doc. 42), Proposed Findings of Fact and Conclusions of Law (138), or elsewhere.

2009 Settlement.[21]

"Under Florida law, it is axiomatic that a party may waive any rights to which he or she is legally entitled, by actions or conduct warranting an inference that a known right has been relinquished." Sacred Heart Sys., Inc. v. Humana Military Healthcare Serv., 601 F.3d 1159, 1181 (11th Cir. 2010) (quotation omitted).  Therefore, "where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement."  Id.  However, because "Florida courts have  consistently e n f o r c e d anti-waiver clauses," the parties may alter these common law rules of waiver.  See id. at 1182 (quotation omitted).

Although Landstar allowed AC to follow the interim REZ policy prior to July of 2009, the Agency Agreement states that "[f]ailure on the part of either party to enforce any provision of the Agreement shall not constitute a waiver of such provision." (P-1 at 8.)  Based on this anti-waiver clause, the Court finds that, although Landstar accepted non-conforming conduct prior to the July 2009 Note, it did not waive its right to enforce the terms of the Agency Agreement with respect to future conduct.  As evidenced by the terms of the July 2009 Note, Landstar asserted this right and demanded that AC follow the finalization procedures required under the Agency Agreement going forward.

The parties also did not reach an agreement to permanently modify the contract with

---

[21] The Court need not address whether a different result would be reached with respect to the parties' conduct prior to the 2009 settlement, when Landstar knowingly allowed AC to finalize under the interim REZ policy.  Even if AC only breached the Agency Agreement after July 2009, Landstar was entitled to terminate without giving prior notice.

respect to the procedure for finalization.  "It is well established that the parties to a contract can discharge or modify the contract, however made or evidenced, through a subsequent agreement." St. Joe Corp. v. McIver, 875 So.2d 375, 381 (Fla. 2004).  The parties' conduct may be sufficient evidence of such an agreement. Id. at 382.  However, "a party cannot modify a contract unilaterally. All the parties whose rights or responsibilities the modification affects must consent." Id.

Although the parties' conduct suggests that they agreed (at least implicitly) to use a different procedure to account for REZ charges than that mandated by the Agency Agreement in 2006, 2007, 2008, and early 2009, Landstar continued to discuss with AC the need to follow the REZ policy mandated by the Agency Agreement. (See Doc. 134, Trial Tr. vol. 4 at 25, 100-01, 189; P-91.)[22]  Landstar thus did not consent to a permanent modification of the finalization policy.

Because Landstar did not waive or modify its rights under the Agency Agreement, it retained the contractual right to demand that AC prospectively comply with the finalization policy required by the Agency Agreement despite its earlier acquiescence in AC's use of the interim REZ policy.  Beginning at least in July 2009, Landstar required such compliance. (See pp. 5-6.)  AC acknowledged this by signing the July 2009 Note, which states that AC "agrees to finalize billing and pricing only following shipment delivery when all transportation costs are known."  (P-108.)  AC's continued adherence to the interim REZ policy and

---

[22] In addition to other testimony at trial, this finding is supported by Lanstar's repeated demands that AC finalize loads only after all actual REZ costs were known.  (See supra p. 4.)

consequent failure to follow the finalization policy required under the Agency Agreement thus constituted a breach.  Landstar was therefore legally permitted to terminate the Agency Agreement without giving prior notice to AC, and defendants are not entitled to damages resulting from AC's termination.[23]

       4.    *AC's Claims for Breach of the Agency Agreement*

Although defendants allege that Landstar failed to pay proper commissions and other compensation, the Court has already resolved this claim by finding that AC owes $274,829 to Landstar in commission overcharging and other adjustments in addition to the 2009 settlement.  This amount includes credits given to AC for any unpaid commissions or other adjustments.  (See Doc. 135, Trial Tr. vol. 5 at 158-66.)[24]

AC's claims that Landstar breached the Agency Agreement by failing to properly support AC's truckload business is also without merit.  Although AC alleges that it lost a significant contract with Campbells because Landstar's network was unable to provide

---

[23]  The Court alternatively finds that, even if AC's termination was improper because Landstar failed to give 30 days notice, defendants suffered no legally cognizable damages. The representative from Campbells who was in charge of securing the intermodal contract, Todd Cunningham, stated in his deposition that the manner in which AC was terminated did not play a role in Campbells' decision to cease doing business with AC. Instead, Campbells decided to continue to do business with Landstar because Campbells did not need the amount of capacity HUB had to offer, Campbells wanted to expand its business with carriers that it used for other services, and some Campbells employees thought AC had performed "sloppy work." (Court Ex. A, Cunningham Dep. at 43-45.) Thus, although Campbells had no plans to end its relationship with AC prior to AC's termination by Landstar (id. at 32), Campbells ceased doing business with AC because it did not wish to switch HUB. Finally, the Court was wholly unpersuaded by the trial testimony of Stanton Meltzer, defendants' damages expert, regarding lost profits. (See Doc. 132, Trial Tr. vol. 6 at 85-240.)

[24] Additionally, any claims which arose prior to March 2009 were extinguished in the 2009 settlement.

adequate truckload capacity, AC has not demonstrated that Landstar was under any legal obligation to do so.  The Agency Agreement contains no provision which requires Landstar to provide any specific level of truckload capacity; instead, AC was responsible for arranging shipments with carriers and billing customers.  (P-1 at 14-17.)  Moreover, the evidence adduced at trial demonstrated that AC was aware that Landstar utilized Business Capacity Owners ("BCOs") and that such independent truck owner operators could not be required to pick up any particular load.  AC thus knew Landstar could not guarantee that its BCOs would provide the amount of capacity required by Campbells.  (See Doc. 134, Trial Tr. vol. 4 at 62-63; P-72; P-209.)[25]

Because defendants have not proven that Landstar breached the Agency Agreement (or that any alleged breach was done in bad faith), defendants' claims for breach of the implied covenant of good faith and fair dealing also fail.  See Burger King Corp. v. Weaver, 169 F.3d 1310, 1317-18 (11th Cir. 1999).  ("[N]o independent cause of action exists under Florida law for breach of the implied covenant of good faith and fair dealing. Where a party to a contract has in good faith performed the express terms of the contract, an action for breach of the implied covenant of good faith will not lie.").  Defendants' claim for breach of the implied duty of good conduct is also without merit.[26]

---

[25] The Court alternatively finds that any claims relating to the truckload business are barred by the 2009 settlement and the August 2008 Note. (See Doc. 131, Trial Tr. Vol. 3, at 73-74.)

[26] Defendants have cited no Florida case that has applied this implied duty.  The Restatement, however, provides that "a principal who has contracted to employ an agent has a duty to conduct himself so as not to harm the agent's reputation nor to make it impossible for the agent, consistently with his reasonable self-respect or personal safety, to continue

5.    *Summary of Damages under the Agency Agreement*

The Court has found that AC owes Landstar $267,595 for the period prior to March 2009 and $274,829 for the remainder of the agency relationship.  These amounts include set-offs for any amounts owed to AC.  Moreover, the Court has rejected defendants' claims for additional damages.[27]  AC thus owes Landstar a total of $542,424 for damages arising under the Agency Agreement.  Because Haskins signed a personal guaranty as to AC's obligations under the Agency Agreement, she is jointly and severally liable.  (See P-1 at 11.)

"[I]t has long been the law in Florida that in contract actions, and in certain tort cases, once the amount of damages is determined, prejudgment interest is allowed from the date of the loss or the accrual of cause of action."  Bosem v. Musa Holdings, Inc., 46 So.3d 42, 46 (Fla. 2010).  Moreover, "Florida law supports the proposition that prejudgment interest can be awarded properly from the latest possible date of loss."  SEB S.A. v. Sunbeam Corp., 148 F. App'x 774, 795 (11th Cir. 2005).  Because Landstar terminated AC on December 1, 2009, that date represents the last date on which Landstar could have sustained a loss under the Agency Agreement.  Accordingly, the Court will award pre-judgment interest from December 1, 2009.  See id. (awarding pre-judgment interest from last date of the term of the contract between the parties).

―――――――――――

in the employment."  Restatement of Agency (Second) § 437. Even assuming that this is a valid claim under Florida law, AC has not adduced sufficient evidence to show that Landstar is liable on this claim.

[27] The Court thus need not address Landstar's argument that Haskins lacks standing to seek relief.  (See Doc. 139 at 7-8.)

B.    Claims Arising Under the Promissory Notes

In addition to its claims under the Agency Agreement, Landstar has also brought suit on the August 2008 Note, which has an original principal amount of $305,156.81, and the July 2009 Note, which has an original principal amount of $32,000.   The August 2008 Note provided for forgiveness of AC's debt over a period of seven years if AC could meet certain revenue requirements, while the July 2009 Note was required to be paid over a three year period through weekly deductions to AC's commissions.  However, Landstar had the option to accelerate the balance of both notes upon an event of default or termination of the Agency Agreement.  (P-108; P-185.)  Landstar has exercised that option and now seeks recovery of all outstanding principal and interest.  Moreover, Haskins signed a personal guaranty with respect to each note, making her jointly and severally liable.  (P-108; P-185.)

Under Florida law, "[t]he promissory note is itself evidence of the existence of the debt and its introduction into evidence is sufficient to establish a prima facie case.  When it is regularly admitted into evidence no additional evidence of the present existence of the debt is necessary upon the case of the Plaintiff."  Jacobs v. Becks, 355 So.2d 1241, 1243 (Fla. 1st DCA 1978)(quotation omitted); see also Cole Taylor Bank v. Shannon, 772 So.2d 546, 550 (Fla. 1st DCA 2000)("A payee's possession of an original uncanceled promissory note raises a presumption of non-payment that shifts the burden of proof to the payor to establish payment or another defense.").  Because Landstar introduced the notes into evidence, it has established a prima facie case.  (See P-108; P-185.)

However, defendants contend that Landstar cannot recover under the notes because Landstar unjustly prevented AC from meeting its obligations thereunder.  (Doc. 138 at 32-

33.)  According to defendants, Landstar's improper termination of AC prevented it from meeting the revenue targets set out in the August 2008 Note that would have resulted in the debt being forgiven.  Moreover, defendants argue that AC's termination prevented it from earning the commissions that would have been used to pay back the July 2009 Note.  (Id.) Defendants assert that Landstar should not able to benefit from its wrongful behavior.

Defendants' argument has no merit.  First, because Landstar's termination of AC was consistent with the Agency Agreement, Landstar did not unjustly prevent AC from meeting its obligations under the notes.  Second, even if AC's immediate termination had been wrongful, Landstar had the ability to terminate the Agency Agreement after giving 30 days notice.  (P-1 at 2.)  If it had done so, the notes merely would have been accelerated 30 days later, and the same amounts would have been due.[28]  Thus, even if Landstar had violated the Agency Agreement when it terminated AC without notice, such violation would not have been a material breach of the kind that would have relieved AC of its obligations under the notes.  See, e.g., Burger King Corp. v. Hinton, Inc., 203 F.Supp.2d 1357, 1363-65 (S.D. Fla. 2002)(holding that an allegation of wrongdoing does not relieve a party from paying sums owed); Covelli Family, L.P. v. ABG5, L.L.C., 977 So.2d 749, 752 (Fla. 4th DCA, 2008)(holding that only a "vital or material breach" will relieve the other party of its

---

[28] The August 2008 Note forgave a portion of the principal on an annual basis each August.  Thus, waiting an additional 30 days would not have resulted in additional forgiveness on the Note.  Moreover, since AC has failed to pay on the notes, the same amount of interest would be due.

contractual obligations).[29]

AC is thus liable to Landstar for all outstanding principal under the notes, plus applicable interest.[30]   Moreover, each note provides that, if it "is placed in the hands of an attorney for collection, by suit or otherwise, . . . [AC] will pay all costs of collection and litigation, together with reasonable attorneys' fees." (P-108; P-185.) Landstar is thus entitled to an award of reasonable costs and attorneys' fees relating to litigation over the August 2008 Note and the July 2009 Note.  Because Haskins signed a personal guaranty as to each note, she is also individually liable.

C.   Breach of Fiduciary Duty

Landstar claims that AC breached its fiduciary duties under the Agency Agreement by "engaging in a self-dealing scheme" that involved, among other things, entering inaccurate charges into ORBIT, understating shipping costs, failing to repay excess commissions, and otherwise failing to reasonably act in the best interests of Landstar. (Doc. 1 at 9-11.)

Under Florida law, "[t]he elements of a claim for breach of fiduciary duty are:  the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages."  Gracey v. Eaker, 837 So.2d 348, 353 (Fla. 2002).   Breach of

---

[29] The line of cases cited by defendants is inapposite.  These cases hold that "parties who prevent performance of a contract by their own acts cannot take advantage of their own wrong."  Amoco Oil Co. v. Gomez, 125 F. Supp.2d 492, 500 (S.D. Fla. 2000).  Here, even if Landstar should have given AC 30 days notice prior to termination, there is no evidence that Landstar's failure to do so prevented AC from meeting its obligations under the notes.

[30] Because $43,594 of the debt under the August 2008 Note was forgiven on August 1, 2009, the outstanding principal amount is $261,563.  (See Doc. 139-1 at 9.)

fiduciary duty is an intentional tort.  <u>Halkey-Roberts Corp. v. Mackal</u>, 641 So.2d 445, 446

(Fla. 2d DCA 1994).  The Court finds that Landstar has failed to prove that AC breached its

contractually-based fiduciary duty,[31] as there is insufficient evidence that AC intentionally

engaging in a "self dealing scheme" or otherwise purposely acted contrary to Landstar's

interests.[32]

     D.   <u>Fraud</u>

Landstar alleges that AC committed fraud by intentionally making false

representations regarding its shipping costs to induce Landstar to pay inflated commissions.

(Doc. 1 at 12-14.)  Defendants claim Landstar committed fraud by falsely representing that

it had the ability to properly support AC's customers and to process and bill orders.  (Doc.

42 at 42.)  Under Florida law:

> The elements that must be established to prove a claim of fraud are: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation.

<u>Townsend v. Morton</u>, 36 So.3d 865,  868 (Fla. 5th DCA 2010).   The Court finds that the

parties' fraud claims (whether they be fraud in the inducement or fraud in the performance)

fail because there is insufficient evidence that either party intentionally made a false

---

[31] The Agency Agreement states that AC owes a fiduciary duty to Landstar.  (P-1 at 8.)

[32] Moreover, Landstar acknowledged  in its Proposed Findings of Fact and Conclusions of Law that, even if a breach of fiduciary duty were found, damages would be equivalent to those found for AC's breach of the Agency Agreement. (<u>See</u> Doc. 139 at 15-16.)  Although the Complaint requests punitive damages, Landstar has not pursued punitive damages since that time, and the evidence would not support such an award.

representation regarding a material fact upon which the other party detrimentally relied.[33]

### E.   Declaratory Judgment

Defendants seek a declaratory judgment holding that AC's post-contract obligations to Landstar, including AC's obligations under the promissory notes and covenant not to compete, are void due to Landstar's alleged material breaches of the Agency Agreement. Because, as stated above, defendants have not presented sufficient evidence to show that Landstar materially breached the Agency Agreement, the Court declines to grant such declaratory relief.[34]

### F.   Negligent Misrepresentation

Defendants allege that, while Landstar represented that it could support AC's orders and customer relations, Landstar knew or should have known that these representations were false.  (Doc. 42 at 44.)   Defendants further contend that Landstar's inaccurate representations induced them to sign the Agency Agreement.  (Id.)

To establish a claim for negligent misrepresentation, a plaintiff must prove:

> (1) there was a misrepresentation of material fact; (2) the represener either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the represener intended to induce another to act on the

---

[33]  Moreover, Landstar acknowledged  in its Proposed Findings of Fact and Conclusions of Law that, even if fraud were found, damages would be equivalent to those found for AC's breach of the Agency Agreement. (See Doc. 139 at 15-16.)  Although the Complaint requests punitive damages, Landstar has not pursued punitive damages since that time, and the evidence would not support such an award.

[34] The Court also notes that Landstar represents that it "has never attempted to impose or enforce any non-compete obligations" on AC.  (Doc. 139 at 35.)

misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.

Fla. Women's Medical Clinic, Inc. v. Sultan, 656 So.2d 931, 933 (Fla. 4th DCA 1995).  The

Court finds that defendants have failed to prove that Landstar made a false statement

regarding its ability to support AC and its customers without having knowledge of the

statement's truth or falsity.

  G.  Intentional Inference with Business Relationship

  Defendants allege that Landstar intentionally interfered with AC's business

relationships by informing its customers that it had been terminated for improper, fraudulent,

and criminal behavior.  (Doc. 42 at 46-47.)  Under Florida law,

> The elements of tortious interference with a contract or business relationship are: (1) the existence of a business relationship between the plaintiff and a third person, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform; and (4) damage to the plaintiff resulting from the third person's failure to perform.

Seminole Tribe of Fla. v. Times Publ'g Co., 780 So.2d 310, 315 (Fla. 4th DCA 2001).

Normally, some of Landstar's immediate pre- and post-termination conduct (including the

overblown allegations of the original complaint Landstar filed against AC) might require

further analysis.  However, even assuming arguendo that defendants were able to prove

intentional and unjustified interference, they have not proven damages.  Campbells' decision

to remain with Landstar following AC's termination was not caused by any wrongful behavior

on Landstar's part; instead, Campbells' decided not to do business with AC because certain

Campbells employees felt that AC had done "sloppy work" and Campbells did not desire to do business with the HUB Group. (See supra n.23.) Moreover, the Court was otherwise unpersuaded by defendants' lost profits testimony.

## III.    CONCLUSION

Prior to 2009, Landstar allowed AC to deviate from the requirements of the Agency Agreement and accrue a substantial debt to Landstar as a result. During that time, Landstar was willing to forgive portions of AC's debt over the course of the relationship, and the parties anticipated that the remainder of the debt would be paid out of the profits of their business relationship.[35] As a result, for this period the Court has awarded only damages that were agreed to by the parties in the 2009 settlement and the August 2008 Note.

At some point in 2009, however, the parties' relationship deteriorated significantly, and Landstar demanded strict adherence to the terms of the Agency Agreement. AC, however, failed to comply and instead continued to follow a practice that had previously resulted in the significant overpayment of commissions. Although the Court has rejected all allegations of intentional wrongdoing, defendants are nevertheless contractually obligated to repay Landstar for the commission overpayments AC received as a result of its failure to comply with the terms of the Agency Agreement.

In sum, judgment will be entered in favor of Landstar and against AC and Haskins for the following amounts:

•       $542,424 for breach of the Agency Agreement, with prejudgment interest calculated

---

[35] The evidence showed that AC was one of Landstar's highest rated performers.

from December 1, 2009 forward;

- $261,563 under the August 2008 Note, with interest calculated from December 1, 2009 forward;

- $32,000 under the July 2009 Note, with interest calculated from December 1, 2009 forward.

Moreover, the Court will enter judgment against Landstar's claims for breach of fiduciary duty (Count 2), fraud (Count 3), and accounting (Count 10). The Court will also enter judgment against AC's counterclaims for breach of contract (Count 1), breach of the implied covenant of good faith (Count 2), declaratory judgment (Count 3), fraud (Count 4), negligent misrepresentation (Count 5), accounting (Count 6),[36] intentional interference with business relationships (Count 7), and breach of the duty of good conduct (Count 9).

Accordingly, it is hereby

**ORDERED**:

Consistent with these Findings of Fact and Conclusions of Law, no later than **January 24, 2012**, Landstar will submit a Proposed Final Judgment and its claim for costs and attorneys' fees, with supporting documentation.[37] No later than **February 10, 2012**,

---

[36] Although both parties alleged actions for accounting, neither party pursued such a claim at trial or in any post-trial submission to the Court. Based on the evidence submitted at trial, and the conclusions reached in this Order, the Court finds that an accounting is not necessary. Additionally, Landstar's claim for civil theft (Count 9) and defendants' claims for defamation (Count 8), breach of the duty to perform under the terms of the contract (Count 10), and breach of the duty to pay compensation (Count 11) have been dismissed in previous orders. (See Docs. 64, 98.)

[37] The attorneys' fees claim is limited to litigation over the promissory notes.

25

defendants may, if they choose, file a response.  The Court will incorporate any award of costs and attorneys' fees into the final judgment.[38]

      **DONE AND ORDERED** at Jacksonville, Florida this 9th day of January, 2012.


                                      _____
                                      TIMOTHY J. CORRIGAN
                                      United States District Judge

js.
Copies:

counsel of record

---

[38] Moreover, based on the statements of counsel on the record at trial, Landstar's Motion to Strike the Expert Report of Stanton L. Meltzer (Doc. 71) and Defendants' Motion to Exclude Testimony of C. Donald Wiggins (Doc. 72) are **DENIED AS MOOT**.